Richard. M. Pachulski, Esq.
Andrew W. Caine, Esq.
Jeffrey N. Pomerantz, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, California 90067-4100
Telephone: (310) 277-6910

Robert J. Feinstein, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Telephone: (212) 561-7710

Lynn L. Tavenner, Esq. (VA Bar No. 30083)
Paula S. Beran, Esq. (VA Bar No. 34679)
TAVENNER & BERAN, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300

Daniel L. Geyser, Esq.
HAYNES AND BOONE, LLP
2323 Victory Avenue, Ste. 700
Dallas, Texas 75219
Telephone: (303) 382-6219

*Counsel to Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: CIRCUIT CITY STORES, INC., *et al.,* | ) | Case No. 08-35653 (KRH) |
| Debtors. | ) | Chapter 11 |
| | ) | (Jointly Administered) |
| | ) | |
| ALFRED H. SIEGEL, TRUSTEE OF THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST | ) ) ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. 19-03091 |
| | ) | (Consolidated Adv. Proceedings) |
| v. | ) | |
| | ) | |
| UNITED STATES TRUSTEE PROGRAM, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**INTRODUCTION AND SUMMARY OF ARGUMENT**

In *Siegel* v. *Fitzgerald*, 142 S. Ct. 1770 (2022), the Supreme Court

unanimously held that the 2017 Act was unconstitutionally non-uniform under

the Bankruptcy Clause. The case has now returned to this Court to determine

the appropriate remedy. Notwithstanding the government's extensive efforts to avoid liability, the remedy question is ultimately straightforward. Congress imposed an unconstitutional fee increase in 2017, which the Supreme Court has now struck down. The Liquidating Trustee was wrongly compelled to pay unlawful fees under that invalid provision. The only plausible way to erase that past violation is to refund the improper charge.

This conclusion follows directly as a matter of law, logic, and common sense. There is a longstanding presumption that a party subjected to unequal treatment is entitled to affirmative relief; the default is *not* to extend unfavorable treatment across the board. To be sure, in some instances, the government has the option to "level down" and impose higher fees on a favored class—rather than return those higher fees to the injury party. But that remedy is constitutionally adequate only where Congress equalizes the fees during the *relevant* period—the full time in which the invalid fees were incurred. There is no such thing as adequate relief for *past* harms by equalizing *future* treatment. Such "prospective only" relief does nothing to redress any past injury—it leaves the constitutional harm wholly uncompensated. The government's contrary contention simply confuses cases seeking *prospective or declaratory* relief (which this case is not) with those seeking *monetary refunds* based on past

2

unconstitutional treatment (which this case is). It is thus little surprise that the Supreme Court has consistently ordered past refunds where they were sought.

The government responds that if prospective-only relief is insufficient, its alternative proposal should carry the day: it suggests imposing retroactive fees—years after the fact—on all qualifying Chapter 11 cases pending in BA districts. This absurd proposal founders on multiple legal and practical fronts.

First and foremost, while courts do look to Congress's intent in shaping a remedy, Congress here has already spoken—and emphatically *rejected* the government's plan to impose retroactive fees. In 2021, Congress amended the Chapter 11 fee scheme to (finally) compel uniform fees in all nationwide districts—but it expressly limited that command to *future* quarterly payments. That alone is dispositive on the remedy question: When Congress directly confronted the option of imposing uniform fees retroactively in BA districts, it refused to do so—surely because retroactive fees would upset settled expectations, reopen countless closed cases, and unfairly (and impossibly) recalibrate distributions involving hundreds or thousands of recipients in BA districts. The government has no license to ask this Court to judicially redline Congress's work and extend heightened fees to periods Congress refused to reach when it confronted effectively the same question here (read: how to equalize Chapter 11 fees in all districts).

Second, even had the 2021 Act not foreclosed the government's position, the government has separately failed to identify *any* statutory authority permitting it to seek heightened fees in BA districts during the relevant period. The government cannot simply impose fees in BA districts because it wishes to avoid giving back money in UST districts; it must identify affirmative power to impose fees on BA debtors. And there is no statutory provision authorizing a *retroactive* imposition in BA districts. Unless and until Congress grants that authority (which would require countermanding the 2021 Act), the government lacks the power to impose retroactive fees—thus limiting its only permissible choice to providing refunds to UST debtors.

Finally, its non-existent legal authority aside, the government has no realistic way to impose retroactive fees in BA districts—an administrative nightmare that would prove a practical impossibility. The government does its best to avoid spelling out the details, but the upshot is clear: to achieve full retroactive parity, the government would have to clawback and recalibrate every distribution to any recipient in every qualifying Chapter 11 case pending in North Carolina and Alabama over a period of years. That astounding proposal would invite endless chaos and confusion; it would impose severe and destabilizing effects on closed cases and confirmed plans (which were *not* negotiated on an assumption of retroactive 800% fee increases); it would

4

promise years of litigation involving potentially hundreds (or thousands) of clawback lawsuits (as debtors, creditors, professionals, and administrators predictably resist giving back funds distributed years ago); and it would assuredly fail to equalize treatment in any event—as some BA debtors have since dissolved, other funding recipients have died or disbanded, and many distributions have been dissipated or spent.[1]

The government cannot brush aside these issues by simply shrugging and suggesting the Treasury Department will somehow figure it out. Nor can it say that collection efforts can be imperfect—this nightmare scenario is worlds away from "imperfect." This is a recipe for new rounds of endless litigation and disorder that will predictably upend countless bankruptcies, guarantee non-uniform fees in both UST and BA districts, and ultimately leave every key stakeholder (save maybe the government) worse off.

---

[1] The government has not even suggested how it can satisfy the Code in pursuing retroactive fees. How, for example, would it modify confirmed and consummated plans? How would it deal with rules of absolute priority where a higher-priority creditor still has access to distributed funds (which must now be recalibrated for retroactive fees) but a lower-priority creditor does not (and thus in the end potentially recovers a higher percentage than creditors up the chain)? The government has no answer for these questions—and apparently has not even attempted to identify the inevitable universe of problems arising when trying to unwind closed bankruptcies years after the fact.

If Congress actually had an appetite for this non-solution, it had every opportunity to say so in the 2021 Act. It instead sensibly said the opposite. And the government has now had over *a third of a year* since *Siegel* was decided without formulating a genuine plan; it has briefed this issue in multiple courts, and it has yet to explain where it finds the authority to impose retroactive fees in BA districts or how it might even conceivably accomplish that task. It is past time for the government to put its money where its mouth is—yet it has utterly failed to identify a lawful option *besides* refunds to remedy the established constitutional harm.

Because the government has no other legal or practice choice, its motion should be denied and the government should be directed to return the invalid fees paid under an unconstitutional statute.

## ARGUMENT

### A.    The Proper Remedy Is A Full Refund Of Fees—Prospective Relief Cannot Redress A Past Constitutional Monetary Injury

1.    Now that the Supreme Court has declared the 2017 Act unconstitutional, the government is left with a straightforward directive: it must satisfy the "'mandate of equal treatment.'" U.S. Br. 8 (so conceding; quoting *Sessions* v. *Morales-Santana*, 137 S. Ct. 1678, 1698 (2017)). And the most obvious way to "'accomplish[]'" that "'equality'" is to refund the invalid

fees extracted under the unconstitutional provision. That refund ensures that fees were indeed uniform for all similarly situated debtors during the relevant period, and it fully redresses the constitutional injury. See, *e.g.*, *McKesson Corp.* v. *Division of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 31-35, 39-40 (1990); *Iowa-Des Moines Nat'l Bank* v. *Bennett*, 284 U.S. 239, 247 (1931).

Indeed, this refund also matches the Supreme Court's historical practice: "the preferred rule in the typical case is to extend favorable treatment," and "[o]rdinarily, we have reiterated, '[such] extension, rather than nullification, is the proper course.'" *Morales-Santana*, 137 S. Ct. at 1700-1701; see also, *e.g.*, *Heckler* v. *Mathews*, 465 U.S. 728, 739 n.5 (1984). The government simply ignores this default presumption: in the "typical case," the government must give back funds wrongly taken from the injured class—not to cast indeterminate promises to take more funds from favored parties. *Morales-Santana*, 137 S. Ct. at 1701. Yet the government never once recognizes that thumb clearly placed on the remedial scale.

In short, the Liquidating Trustee's rights were violated when he was assessed a drastically higher fee than identically situated debtors in BA districts. *Siegel*, 142 S. Ct. at 1781. "[I]t is well settled that a [party] who has been subjected to discriminatory [fees] through the favoring of others in violation of federal law cannot be required himself to assume the burden of

seeking an increase of the [fees] which the others should have paid. Nor may he be remitted to the necessity of awaiting such action by the [government] officials upon their own initiative." *Iowa-Des Moines Nat'l Bank*, 284 U.S. at 247 (citations omitted). The solution here is simple: He is "entitled to obtain * * * [a] refund of the excess of [fees] exacted from [him]." *Ibid.*

2. a. Yet as its lead argument, the government insists that, even if those trustee fees were unconstitutional, the proper remedy is not a "refund[]" of those invalid fees—"prospective relief alone is the appropriate remedy." Br. 8. As the government sees it, it can cure any non-uniformity by "'leveling up' or 'leveling down,'" and "'the Constitution does not demand'" an "'effective remedy.'" *Id.* at 9. On the contrary, according to the government, it is perfectly sufficient to leave past wrongs unremedied, so long as the government promises "equal treatment" going forward. *Id.* at 10-11.

The government is profoundly mistaken. The constitutional mandate is to *equalize* non-uniform treatment; a refusal to correct a past wrong does not *equalize* that treatment—it *cements* the non-uniformity. A prospective-only "cure" may prevent future violations, but it does nothing to resolve the fact that some debtors paid more than others based on geography alone. And the Constitution requires the fees "as *actually imposed*" on all debtors be the same "during the contested [] period." *McKesson*, 496 U.S. at 43; see also U.S. Br. 13

8

(admitting the constitutional standard requires "[e]quality" to "be restored"). A "prospective" modification does not "restore" uniform treatment—by definition, it impermissibly leaves *unequal* fees in place.

To be sure, the government may sometimes have the option to "level down," but it still has to redress the constitutional violation *in the relevant time period* (read: when the invalid fees were unlawfully extracted). See, *e.g.*, *McKesson*, 496 U.S. at 31-35, 39-40 (1990); see also *Harper* v. *Virginia Dep't of Taxation*, 509 U.S. 86, 100-101 (1993). This is why the government errs in invoking cases seeking declaratory or injunctive relief (rather than monetary damages) in support of its non-remedy. See, *e.g.*, *Morales-Santana*, 137 S. Ct. at 1686. When all relief is forward-looking, it is relatively easy to set a prospective rule by refusing to extend future benefits. But the Supreme Court has made clear that a prospective fix is inadequate when a party seeks redress for *past* unequal treatment. *McKesson*, 496 U.S. at 35, 39-40; *Iowa-Des Moines Nat'l Bank*, 284 U.S. at 247. In those circumstances, the government can only "level down" by tracking down the favored class and demanding equal retrospective payments. That alone serves as a permissible substitute for full monetary relief (read: a proper refund). In sum: "only an *actual* refund (or other retroactive adjustment of the tax burdens borne by petitioner and/or its favored competitors during the contested tax period) can bring about the [required]

*nondiscrimination*." *McKesson*, 496 U.S. at 43; see also *Allegheny Pittsburg Coal Co.* v. *County Comm'n of Webster Cty.*, 488 U.S. 336, 346 (1989).[2]

b. Trying a different tack, the government argues that a backward-looking remedy is not required because the Liquidating Trustee "had a meaningful opportunity to challenge" the increased fees "before" paying them. Br. 11-12 (suggesting he "could have withheld payment and interposed his objections as a defense to enforcement"). According to the government, "[w]here it is possible to seek meaningful predeprivation relief to prospectively address alleged inequality of treatment," "prospective-only relief is permissible." *Ibid.* This is wrong again.

In *McKesson*, the Supreme Court held that a State may remedy an unconstitutional discriminatory tax in one of three ways: (1) by providing a refund to the petitioner of the difference in taxes paid; (2) by collecting back taxes from the other relevant third parties; or (3) by providing for a combination of a partial refund and a partial retroactive assessment of taxes on others. 496 U.S. at 40-41. The Court explained that, so long as the result would

---

[2] The government says these principles apply only in cases of "'comparative economic disadvantage.'" U.S. Br. 11 n.4. That is incorrect. The comparative disadvantage might often explain the *source* of the injury; but parties can also be injured (as here) by being compelled to pay an unconstitutional fee. The relevant principle is how to *remedy* that unconstitutional imposition—not its *cause*.

equalize the taxes "during the contested tax period," the "the Due Process Clause's requirement of a fully adequate postdeprivation procedure" would be satisfied. *Id.* at 41.

The government cannot avoid these options by focusing on *pre-deprivation* hearings, which the Court discussed (but did not apply) in *Harper* and *McKesson*. *Harper*, 509 U.S. at 101-102; *McKesson*, 496 U.S. at 39 n.21. Due process requires a "'clear and certain' remedy" for payments "collected in violation of federal law." *Reich* v. *Collins*, 513 U.S. 106, 108 (1994); *Atchison, T. & S.F. Ry. Co.* v. *O'Connor*, 223 U.S. 280, 285 (1912) ("It is reasonable that a man who denies the legality of a tax should have a clear and certain remedy."). Here, no "clear and certain" pre-deprivation remedy existed for the Liquidating Trustee, much less one that would have reasonably been understood as the "exclusive" means for seeking relief. See *Reich*, 513 U.S. at 111. The government fails to point to any pre-deprivation procedure that was readily available or is currently available to other Chapter 11 debtors. Nor does any such safe procedure obviously exist.

On the contrary, if a debtor fails to pay required quarterly fees, the default rule is that the court "shall" convert the Chapter 11 case to a liquidation under Chapter 7 or dismiss the case altogether. 11 U.S.C. 1112(b)(1), (b)(4)(K) (listing "failure to pay any fees or charges required under chapter 123 of title 28" as

11

grounds supporting "for cause" conversion or dismissal). The threat of having a case dismissed cannot possibly provide the sort of "pre-deprivation hearing" that would satisfy due process or avoid the customary remedy of a refund in cases involving unlawfully collected payments. See, *e.g.*, *McKesson*, 496 U.S. at 39 n.21 (this Court has "long held that, when a tax is paid in order to avoid financial sanctions or a seizure of real or personal property, the tax is paid under 'duress' in the sense that the State has *not provided a fair and meaningful predeprivation procedure*") (emphasis added). And while the government suggests this issue could be adjudicated at a pre-dismissal hearing (Br. 12 & n.5), that is cold comfort to a debtor who faces *dismissal* if its challenge is then rejected.[3]

---

[3] Indeed, the government's own resources underscore the danger of guessing wrong. In the Bankruptcy Administrator's official instructions concerning Chapter 11 quarterly fees for the Northern District of Alabama (cited at U.S. Br. 16 n.9), debtors are clearly warned: "Failure to pay quarterly fees pursuant to 28 U.S.C. § 1930 has significant legal consequences. The United States Bankruptcy Administrator will move for dismissal or conversion of your Chapter 11 case if you fail to make payment when due." U.S. Bankruptcy Administrator for the Northern District of Alabama, *Instructions Concerning Chapter 11 Quarterly Fees* § V; see also *id.* § I ("**FAILURE TO MAKE PAYMENT IN FULL WHEN DUE WILL RESULT IN THE FILING OF A MOTION TO DISMISS OR CONVERT THE CASE.**") (capitalization and emphasis in original). Those risks are not less pronounced in UST districts.

The natural remedy for the unconstitutional non-uniform fees is a refund. And make no mistake: "prospective-relief only" means no remedy at all—for a *proven* constitutional injury. The government would simply leave the non-uniform fees in place for the entire period in question (which was the precise disparity the Supreme Court rejected as unconstitutional). The government's efforts to leave that violation unredressed should be rejected.[4]

## B. Contrary To The Government's Contention, There Is No Viable Option (Legally Or Practically) For Imposing Retroactive Fees In BA Districts

If the government has to provide relief at all, it insists the appropriate remedy is collecting higher fees retroactively in BA districts, not refunding what it unlawfully extracted from UST debtors. The government's position faces insurmountable legal and practical hurdles. It has already been foreclosed by Congress; it has zero affirmative statutory authority; and it would predictably (and inevitably) impose severe and destabilizing effects on

---

[4] In any event, the government relies on cases premised on the Due Process Clause, where predeprivation *procedures* have an obvious role; the question here is the proper remedy for a violation of the Bankruptcy Clause. And the Constitution nowhere says that any and all constitutional injuries can be ignored simply because the injured party *might* have refused to comply with a legal obligation and potentially dodged an injury in advance—again, by ignoring an *existing* mandate to pay (invalid) fees.

13

countless bankruptcy cases—promising to create deep mischief without meaningfully redressing any constitutional injury.

It has now been months since the *Siegel* decision, and the government's proposal remains entirely half-baked. It apparently is still unaware of how many cases its plan would affect. It has no idea how many debtors, creditors, professionals, or administrators received funds, how it would clawback those funds, how it would then recalibrate who gets what in each bankruptcy, and what to do if any debtors or creditors then object to the new plan—as some (previously confirmed) plans will look materially different once the government retroactively extracts shockingly higher fees.

When the Supreme Court said the government may at times "level up" or "level down," it meant *meaningfully* level down—not simply offer empty gestures designed to avoid liability while inviting far greater problems. The government's general shrug in the direction of the Treasury Department (Br. 16)—saying it knows how to collect fees in the ordinary course—says nothing about the immense magnitude of the intractable task the government now invites, much less the disaster awaiting the courts in dealing with reopening dozens or hundreds of closed cases and handling (predictably) hundreds or thousands of actions from BA recipients who refuse to accede to the government's severe retroactive request.

14

There is only one lawful option awaiting the government: providing a full refund of the UST fees it unconstitutionally extracted from the Liquidating Trustee. The government's contrary arguments are meritless.[5]

> 1.  *The government says that Congress's intent controls—while ignoring Congress already refused to authorize retroactive relief*

While courts crafting constitutional remedies consult "the legislature's intent" (*Morales-Santana*, 137 S. Ct. at 1699), Congress's intentions here were unmistakable. In 2021, Congress revised the fee scheme to address this very issue, and it did so by mandating equal fees *prospectively only*. See Pub. L. No. 116-325, §§ 3(d)(2), 3(e)(2)(B), 133 Stat. 5088-5089 (2021). It was aware of the non-uniform treatment; it stated its belief that the fees ought to be (and ought to have been) the same in all districts; and yet it *still* decided against imposing retroactive fees. If Congress would "clearly prefer" retroactive fees in

---

[5] The government closes its brief by arguing that fees should not be refunded "immediately" until a final and non-appealable judgment has issued. Br. 18-19. Without necessarily agreeing with the government's statutory analysis, the Liquidating Trustee agrees it is prudent to await the final disposition of this issue before fees change hands in either direction. The Liquidating Trustee also notes that the government now correctly concedes its obligation to turn over the unconstitutional charges in the event "the required remedy is a refund." Br. 7 n.3 (committing that "the United States will pay Plaintiff the amount of any overpayment" should it lose on this remedy issue).

15

BA districts, one has to wonder why Congress rejected precisely that relief in 2021.

In suggesting otherwise, the government simply asks the wrong question. According to the government, Congress undoubtedly would prefer a scheme imposing higher fees everywhere than abandoning those higher fees nationwide. Br. 13-14. But the question here is not whether *going forward* Congress would want to level up for everyone (indeed, it assuredly would); the question here is whether Congress would wish to remedy *past unequal treatment* by imposing a severe and disruptive *retroactive remedy*. And that presents a very different question.[6]

Retroactive impositions are profoundly disruptive. They eviscerate settled expectations, often invite deep unfairness, and improperly frustrate completed transactions. There is a reason courts traditionally refuse to presume a law has retroactive effect absent a clear legislative directive. See, *e.g.*, *Landgraf* v. *USI Film Prods.*, 511 U.S. 244, 265-267 (1994) (describing the "antiretroactivity principle" and its longstanding jurisprudential roots); *id.* at 270 ("Since the early days of this Court, we have declined to give retroactive

---

[6] In passing, the government at least admits the intolerable reality of its proposal: "a retrospective unwinding of years of completed payment transactions." Br. 10-11.

effect to statutes burdening private rights unless Congress had made clear its intent."). Yet here this is no indication that Congress would have balanced that distinct policy question—whether to apply the 800% fee increase retroactively—the same way it balanced the *separate* question whether to impose that increase in BA districts going forward. The government cannot substitute the lack of *any* legislative statement with the cavalier attitude that Congress would automatically endorse the extreme retroactive imposition (and massive disruption and chaos for consummated plans, closed cases, and long-ago-spent distributions) simply because it embraced *prospective* uniformity.

Indeed, the appropriate question—whether Congress would desire to impose *retroactive* liability to remedy the unconstitutional treatment—is not even addressed in the government's brief.[7]

In short, Congress had its chance to impose retroactive liability in the 2021 Act. There is no need to guess about Congress's ultimate preferences because Congress has already made its preferences clear: when amending

---

[7] Contrary to the government's contention, it makes no difference that "at the time of the 2021 Act, the Supreme Court had not yet held the 2017 Act was unconstitutionally non-uniform." Br. 15 n.7. If Congress truly believed that everyone in BA districts should have been paying higher fees all along, it would have imposed higher fees retroactively in those districts. It instead did the opposite—despite being fully aware of the constitutional crisis consuming the lower courts over the non-uniform fees.

Section 1930(a)(7) in 2021 to (finally) make fees mandatory in all districts, *it elected to apply that change prospectively only*. See Pub. L. No. 116-325, *supra,* § 3(e). We thus know that Congress elected *against* "leveling down" and imposing fees retroactively on parties in BA districts. The government cannot now ask this Court to do what Congress refused without flouting that legislative intent.

> 2.     *The government has failed to identify any statutory authority permitting it to collect higher fees in BA districts during the relevant period*

The government's proposal faces another independent problem: even had the 2021 Act not foreclosed its position, the government still has zero statutory authority to collect higher fees in BA districts looking backward.

If the Treasury Department does indeed later ask BA debtors, creditors, professionals, and administrators to return past distributions to cover higher fees, what would be the source of its authority? Nothing in Section 1930 authorizes the imposition of retroactive fees in past quarters. Quite the contrary, again, when the 2021 Act fixed the statutory flaw and required uniform fees, the enactment was designated prospective only—expressly limiting its command to *future* quarterly payments. And multiple parties have already raised substantial retroactivity challenges predicated merely on the fact cases were *pending* on the 2017 Act's effective date; while those challenges

generally lost, there is little doubt similar challenges would succeed against an attempt to impose higher fees years after a bankruptcy has closed.

That means that even if the government truly believes Congress would tolerate a severe retroactive clawback, the government currently has no affirmative power to impose the higher fees in the relevant period. It needs congressional action to pursue a retroactive remedy—which it apparently has neither sought nor obtained. That again leaves a single lawful answer: the Liquidating Trustee cannot "be remitted to the necessity of awaiting such action by [Congress]," but is "entitled," now, "to obtain * * * refund of the excess of [fees] exacted from [him]." *Iowa-Des Moines Nat'l Bank*, 284 U.S. at 247.[8]

3.    *The government has no practical means of retroactively imposing uniform fees in BA districts—and its half-baked proposal invites an administrative morass*

Aside from all its other legal defects, the government's proposal fails simply as a matter of practical reality. The government has no realistic means of tracing all the funds distributed in dozens or hundreds of BA bankruptcies to

---

[8] This again presents a different question than *prospective-only* relief. In such instances, courts can simply strike statutory exceptions (or recognize severability instructions) to leave statutory authority fully operational. See, *e.g.*, *Morales-Santana*, 137 S. Ct. at 1701; *Levin* v. *Commerce Energy, Inc.*, 560 U.S. 413, 420 (2010). Here, however, as with most retroactive remedies, a legislative body must enact positive laws authorizing retroactive impositions before a "level down" option is legally viable.

potentially hundreds or thousands of recipients, many of whom may no longer exist. Chapter 11 plans are generally structured to take into account available funds. There is no fair means of asking debtors to pay higher fees unilaterally without first clawing back all distributions and asking each recipient (creditors, professionals, administrators, etc.) to pay their pro rata share. And once the 2017 Act's staggering fees are exacted on those bankruptcies, there is no guarantee each confirmed (and consummated) plan would still even work—assuming a reorganized debtor remains in existence today.

And this says nothing of the predictable fallout of the government's proposal. Most funding recipients will not willingly hand over distributions received years ago in closed cases; they will inevitably resist the government, inviting thorny litigation (involving both statutory and constitutional defenses) to these tardy collection actions. Courts will be left asking how to adjudicate those cases while also unscrambling the egg of otherwise closed Chapter 11 cases—dealing with an endless series of questions about how to reallocate funds when drastically higher fees suddenly take a chunk out of negotiated distributions.

Rather than responsibly address any of these obvious issues, the government breezily points to the Treasury Department and suggests it can invoke its existing "process" for "collecting those fees." Br. 16. It requires scant

comment to think this existing process is not designed to grapple with anything remotely resembling this situation—involving the reopening of closed cases, lawsuits to clawback distributions, recalibrating the pro rata share of thousands of bankruptcy participants, and so on.

The government has now had over four months since the Supreme Court declared the 2017 Act unconstitutional. It has briefed the question in multiple courts (now including this one). Yet it apparently still has no idea how it would actually seek to impose higher fees retroactively in every single qualifying BA case—or any rough sense of the true level of disruption this would cause. Nor does the government explain what to do with the fact that other courts (including the Tenth Circuit) have already ordered refunds. See *John Q. Hammons Fall 2006, LLC* v. *Office of the U.S. Tr. (In re John Q. Hammons Fall 2006, LLC)*, No. 20-3203, Order at 6 (10th Cir. Aug. 15, 2022). Any contrary decision would immediately reintroduce a new disuniformity into a system the Supreme Court just worked to correct.

Finally, notwithstanding all the above, the government insists it is easier to collect higher fees from debtors in two States than refund excess fees to debtors in 48 States. This ignores the obvious difference between the two options. A refund simply leads to more funds to distribute in accordance with an existing plan. A clawback attempt—from potentially thousands of

21

recipients—involves identifying and chasing down *every distribution of funds* from each relevant bankruptcy; chasing down each recipient to demand a repayment of their pro rata share of higher fees; and, inevitably, encountering hundreds or thousands of collection actions—which themselves could lead to full-blown constitutional litigation. One of these options is not like the other.[9]

In sum, while the government floated a theoretical "leveling down" option in the Supreme Court, the question is no longer hypothetical. The government must identify a concrete action plan for clawing back funds. It must identify statutory authority for carrying out that plan. It must cultivate information on the plan's feasibility, including the number of debtors, creditors, professionals, and administrators involved, including how many remain solvent or in business, and how it plans to litigate challenges to its retroactive impositions. The government cannot merely wait indefinitely for (non-existent) new legislation authorizing retroactive relief, nor any new legal or regulatory directive that may never come. And the government cannot shift the burden to the injured party to pursue that legislative relief or explain to the

---

[9] Nor does the government consider that not every UST debtor entitled to a refund may seek that relief. Especially with cases closed, many may decide the game is not worth the candle (particularly given the prospect of litigating waiver and forfeiture defenses).

government how best to do its job. See *Iowa-Des Moines Nat'l Bank*, 284 U.S. at 247 (so concluding).

The government has had every opportunity to show up in this Court with a viable scheme for imposing retroactive fees, if that is what it truly wishes to do. It instead filed a brief underscoring how unprepared the government obviously is to assume an unprecedented task of unknown magnitude. While the Supreme Court has hinted that "a good-faith effort to administer and enforce such a retroactive assessment *likely* would constitute adequate relief" (*McKesson*, 496 U.S. at 41 n.23 (emphasis added)), the government's effort here falls woefully short of good faith—and the predictable hurdles the government's scheme invites shuts the door on any realistic prospect of achieving uniformity in the relevant period.[10]

There is an obvious reason that Congress did not impose retroactive fees in the 2021 Act—despite purporting to agree that higher fees ought to have been imposed in the relevant period. There is no practical or viable mechanism for even attempting to collect those fees without making everything immeasurably worse.

---

[10] In any event, the Supreme Court suggested that "miss[ing] a few in-state taxpayers" might not defeat a retroactive effort to level down. *McKesson*, 496 U.S. at 41 n.23. The government's ill-concocted plans here will predictably miss far more than a "few" BA participants.

**C.    The Government Cannot Reduce Its Constitutional Liability By Exempting Fees Collected During The First Three Quarters Of 2018**

According to the government, even if it otherwise must refund any invalid fees, it should not have to pay "for the first three quarters of calendar year 2018"—as "both the 2017 Act and the Judicial Conference" supposedly "imposed the same fees across all judicial districts" during those quarters. Br. 17.

The government's last-ditch argument is baseless. The Supreme Court already rejected the functionally identical argument—noting it was the *statute itself* that permitted the non-uniform fees. *Siegel*, 142 S. Ct. at 1782 n.2. Whatever *should* have happened in 2018, different fees were in fact charged because Congress's non-uniform scheme permitted that result—which is precisely why the government lost on this point in the Supreme Court. Had the statute *required* the Judicial Conference to adopt uniform fees, it might be a different story. But the Judicial Conference instead exercised its discretion in light of the drastic change in fees, which it was entitled to do. *Ibid.* ("[P]rior to the 2021 amendment, the fee statute did not *require* the Judicial Conference to impose an equivalent increase. *It is that congressional decision that led to the disparities at issue here.*") (emphasis added). The government cannot now

ignore the Supreme Court's mandate by recasting the same theory in slightly different terms.

In any event, the Judicial Conference's 2018 order countermanded any alleged earlier "requirements" by confirming that higher fees would *not* be collected before October 2018—and indeed would not even be collected prospectively for any pending BA cases. U.S. Br. 17 (so conceding). That is not a "*nunc pro tunc*" order (contra U.S. Br. 17 n.10)—it is a policy determination that binds the BA districts and established the relevant rules. And Congress ultimately reaffirmed the core of that decision in the 2021 Act; it could have always ordered BA debtors to pay higher fees retroactively (including for the first three quarters of 2018). It instead limited higher fees in BA districts to future quarters alone. The government has no authority for countermanding that legislative decision or rewriting an enacted federal law.

*   *   *

The Supreme Court declared the 2017 Act unconstitutional under the Bankruptcy Clause, and the government is now responsible for refunding the invalid fees it exacted under that provision. The government may prefer to avoid responsibility for past constitutional injuries. But prospective relief cannot restore uniformity (or equal treatment) for past periods where that treatment was not equal, and Congress has already shut the door on a

retroactive "level down" remedy—by imposing higher fees in BA districts prospectively only. And the government anyhow has yet to devise any plausible way to claw back funds distributed years ago without inviting chaos and disrupting closed cases that were resolved long ago. The reason for the government's failure is obvious: there is no viable way to retroactively impose fees in BA districts. A full refund is the government's only constitutionally permissible option.

## CONCLUSION

The government's motion should be denied, and this Court should enter an order directing the government to turn over any unlawful fees paid under the invalidated 2017 Act.

Respectfully submitted,

Alfred H. Siegel, Trustee of the Circuit City Stores, Inc., Liquidating Trust

Dated: October 18, 2022
  Richmond, Virginia

By: */s/      Lynn L. Tavenner*
Lynn L. Tavenner, Esq. (VSB No. 30083)
Paula S. Beran, Esq. (VSB No. 34679)
Tavenner & Beran, PLC
20 North 8th Street
Richmond, Virginia 23219
Telephone: (804) 783-8300

Richard. M. Pachulski, Esq.
Andrew W. Caine, Esq.
Jeffrey N. Pomerantz, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, California 90067-4100
Telephone: (310) 277-6910

Robert J. Feinstein, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Telephone: (212) 561-7710

Daniel L. Geyser, Esq.
HAYNES AND BOONE, LLP
2323 Victory Avenue, Ste. 700
Dallas, Texas  75219
Telephone: (303) 382-6219

*Counsel to Alfred H. Siegel, as Trustee of the
Circuit City Stores, Inc. Liquidating Trust*

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2022, I electronically filed the foregoing with the Clerk of this Court using the CM/ECF system which will send notification of such filing to all ECF registrants in the adversary proceeding. I further certify that the foregoing was emailed to counsel for the Defendants as follows:

KATHRYN R. MONTGOMERY
Assistant United States Trustee
Department of Justice
Office of the United States Trustee
701 East Broad Street, Suite 4304
Richmond, Virginia 23219

RAMONA D. ELLIOT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
BETH A. LEVENE
Trial Attorney
Department of Justice
Executive Office for
United States Trustees
441 G Street, N.W., Suite 6150
Washington, DC  20530

*/s/ Lynn L. Tavenner*
Counsel